**FITZROY GARDINER d/b/a WESTERN TRADING ENTERPRISES, Plaintiff**

**v.**

**VIRGIN ISLANDS WATER AND POWER AUTHORITY, Defendants**

Civil No. 1990/295

District Court of the Virgin Islands

Div. of St. Croix

August 14, 1995

Carey-Anne Moody, Esq., (Jack K. Dema), St. Croix, U.S.V.I., *for Plaintiff*

Barbara Twine-Thomas, Esq., General Counsel, Virgin Islands Water and Power Authority, St. Thomas, U.S.V.I. *for Defendant*

BROTMAN, *U.S. District Judge* (Sitting by Designation)

### MEMORANDUM OPINION

Before the Court are plaintiff's motion for summary judgment, filed June 28, 1991, and defendant's opposition to plaintiff's motion, filed October 17, 1994. In addition to these filings, plaintiff filed a Statement of Material Facts Not in Issue, in compliance with LRCi 56.1, on July 14, 1995. On July 25, 1995, defendant filed its

Response to Plaintiff's Statement of Material Undisputed Facts. On July 28, 1995, plaintiff filed a reply to defendant's response taking issue with several of the facts defendant claimed were undisputed. For the reasons discussed herein, plaintiff's motion for summary judgment is granted with respect to liability and a trial will be scheduled to determine damages.

## BACKGROUND AND FACTS

On September 17 and 18, 1989, Hurricane Hugo struck the Virgin Islands with tremendous destructive force leaving most essential services on St. Croix destroyed or badly damaged. On September 19 the government of the Virgin Islands declared a state of emergency. On September 20, 1989 the President of the United States declared that a major disaster existed in the Virgin Islands, thus authorizing federal disaster relief efforts. FEMA-Territory Agreement ("FEMA-Terr Agrmnt") at 1.

It was apparent to both federal and local officials in the immediate aftermath of Hugo that the water delivery system on St. Croix was severely damaged and that providing fresh water to the citizens of St. Croix would have to be a top priority. See, e.g. Deposition of Bruce Green, employee of the U.S. Geological Survey "USGS" ("Green Dep.") at 13, 15; Deposition of Steven Singer, FEMA coordinating officer for St. Croix ("Singer Dep.") at 26; Deposition of Alberto Bruno-Vega, Executive Director of the V.I. Water and Power Authority "WAPA" ("Bruno-Vega Dep.") at 8; Deposition of Romeo Cipriani, Superintendent of the Water Distribution System for WAPA on St. Croix, ("Cipriani Dep.") at 8. It is clear from the exhibits submitted to the Court that there was much confusion and disorder in the days immediately following the hurricane due to inoperative communications systems, blocked roads and decimated basic services. Cipriani Dep. at 7, 8, 35. Green Dep. at 13-14. For this reason, it is difficult to piece together the exact chronological order of events during this time period. Nevertheless, the Court has found that there is no dispute with respect to the events relevant to the contract claim at issue.

After the storm, Mr. Cipriani made his way to his office at WAPA on September 19 and 20 and began to assess the damage and make plans. Cipriani Dep. at 8-9. Cipriani's job was to "oversee the entire

operation of ... the water distribution system in St. Croix (Bruno-Vega at 7) and Mr. Cipriani was very concerned about the potential dire public health effects of the hurricane's damage to the water system. Cipriani Dep. at 9.

By September 21 federal officials of various agencies had begun to arrive in substantial numbers to assist Territorial government officials deal with the disaster. The group of federal and local officials who were attempting to coordinate a response to the disaster apparently identified Bruce Green of the USGS as someone who could assist in the effort to restore water service. On September 21, Mr. Green was located by the National Guard and brought to emergency headquarters. Green Dep. at 10-11. Because of previous work in cooperation with WAPA, Mr. Green knew of some wells fields, owned by WAPA, that might be used to provide fresh water. He brought the wells to the attention of the group at emergency headquarters and explained what equipment would be needed to make the wells operational.[1] Green Dep. at 13, 15-18. The Army Corps of Engineers ("COE") was assigned the task of obtaining pumps and generators for the project. Singer Dep. at 26.

Whatever the exact order of events, one thing is clear from the documents submitted to the Court, by Thursday September 21, Mr. Cipriani and Mr. Green were working together closely to achieve the goal of using the Concordia and Adventure well fields (comprising about 45 wells) to provide fresh water for the citizens of St. Croix. Within approximately three weeks—or by early October—the system was ready to operate. Green Dep. at 26. The plan to utilize the well fields was complicated, however, by the need to provide 24-hour security for the equipment that was needed at each well site. The generators and pumps needed for the project were in extremely short supply on St. Croix and theft was a real concern. Green Dep. at 27-28; Bruno-Vega Dep. at 16; Cipriani at 10-11. Initially, in the first days of October, security for the equipment at the well sites was provided by WAPA personnel. On October 2, however, several of these employees were accosted by

---

[1] It is unclear from the record whether Mr. Green met first with Mr. Cipriani and then with the disaster coordinating group or vice-versa. *See,* Cipriani Dep. at 9; Green Dep. at 10-13. The chronology of these events, however, is irrelevant to the question of whether a contract existed between WAPA and Mr. Gardiner.

people attempting to obtain the generators and, fearing for their safety, the WAPA employees refused to provide security services. Cipriani at 13; Bruno-Vega at 16. Federal armed forces and the local National Guard also refused to provide the necessary around the clock security. Green Dep. at 28.

Mr. Cipriani of WAPA and Mr. Green of the USGS, worked together to identify and locate a private contractor who could provide the requisite security. Both men knew of Mr. Fitzroy Gardiner and his Western Trading Enterprises corporation ("WTE") because he had done work in the past for WAPA.[2] Cipriani Dep. at 14; Green Dep. at 36. Ultimately, both men approached Mr. Gardiner together in La Reine, and discussed the scope of security and maintenance needs of the well field project. The men also discussed the fact that Mr. Gardiner would submit his invoices to WAPA. Green Dep. at 36; Cipriani Dep. at 14. It is not clear when Mr. Gardiner first learned that disbursements by WAPA would be reimbursed by the federal government for WAPA's payments to Mr. Gardiner after the submission of the requisite Damage Survey Reports ("DSRs"). Mr. Green's deposition testimony suggests that this subject arose at the first meeting in La Reine, while Mr. Gardiner remembers learning this fact only later, after he had submitted his first invoices. Green Dep. at 37; Deposition of Mr. Fitzroy Gardiner, president and sole proprietor of WTE ("Gardiner Dep.") at 20. Following this conversation between the three men, Mr. Gardiner agreed to undertake the project and began work immediately.

There is no dispute among the parties that Mr. Gardiner performed the tasks he had been assigned exceptionally well. There does, however seems to have been some concern about the prices Mr. Gardiner charged for his services. On October 25, 1989, at a meeting attended by Mr. Gardiner, Mr. Cipriani, and Mr. Fred Rounsaville of the Army COE,[3] Mr. Gardiner was asked to, and

---

[2] Throughout this opinion reference is made to a contract between Mr. Gardiner and WAPA. When this phrase is used the Court is actually referring to a contract between WAPA, and Mr. Gardiner acting on behalf of WTE.

[3] The various deponents have different recollections about who else, if anyone was in attendance at the October 25 meeting. Mr. Green may have been there as well as Mr. David Shriver from the Army COE.

agreed to, lower his hourly rates somewhat from $ 30/hr. during the day and $ 35/hr. during the night, to $ 22.50/hr. during the day and $ 27.50/hr. at night. It is the recollection of the participants of this meeting that Mr. Rounsaville actively participated in the negotiation and made arguments about why the rates should be lower. Green Dep. at 41; Gardiner Dep. at 21-23.

On November 2, 1989, Mr. Gardiner received his first payment of $ 282,275.00 (for the weeks ending October 7 and 14) from WAPA in the form of a check signed by Mr. Bruno-Vega and Mr. Nellon Bowry, chief financial officer and comptroller of WAPA. Check # 11203 and check stub. On or about the same day that Mr. Gardiner received this first check, he again met with Mr. Rounsaville and renegotiated his hourly rate to $ 20/hr. during the day and $ 25/hr. at night. Gardiner Dep. at 35-36; document entitled "Daytime and Nighttime Hourly Rates" ("Rates Doc."). After having agreed upon the new rate, Mr. Rounsaville signed a document showing the reduction in rates for the category of "Security Crews" and wrote that the new lower rates would begin "on the 6th week (November 5[)]". Rates Doc. On approximately November 9, Mr. Gardiner received payment for work done in the last two weeks of October totaling over $ 334,000.00. Check stubs numbered 11227 and 11204.

Sometime after receiving his second payments, Mr. Gardiner again submitted invoices. This time, when he tried to obtain payment he was informed by Mr. Bowry that there was a problem and that a check could not be immediately issued. The depositions conflict substantially as to exactly what Mr. Gardiner was told, but, again, these conflicts are not relevant to the question at hand. What is clear from the depositions is that Mr. Gardiner was never told by WAPA to stop providing security and maintenance services—in fact there is some testimony that he was specifically told to continue working by both Mr. Cipriani and Mr. Bowry. Gardiner Dep. at 78, 80. Nor was Mr. Gardiner told by anyone at WAPA that they believed that his contract was with the federal government and not with WAPA. Deposition of Mr. Nellon Bowry, chief financial officer and comptroller of WAPA ("Bowry Dep.") at 43. In fact, Mr. Gardiner did testify that, on one of his visits to WAPA to attempt to get paid, he was shown a check made out to WTE for $

412

142,000 and that he continued to work in reliance on that demonstration of intent to pay. Despite the fact that he had not been paid, Mr. Gardiner continued to provide security and maintenance services until approximately mid-December when the water distribution system for St. Croix was once again fully operational.

On November 21, 1989, the WAPA governing board issued a resolution, numbered 240, which retrospectively authorized Hugo-related payments and transactions made by Mr. Bruno-Vega, Executive Director of WAPA. The resolution reads in part:

> WHEREAS, in the wake of the Territory's recovery from the ravages of Hurricane Hugo the immediate restoration of electric and water services to essential facilities throughout the Territory, and the reasonably timed restoration of said services to the entire community, resulted in an emergency of the greatest magnitude; and further, an appropriate and timely response by the Authority to the emergency conditions made it unreasonable and inconvenient for the Governing Board of the Authority to review and approve each contract of the Authority in excess of $ 75,000; and WHEREAS, in an informal emergency meeting of the Governing Board, and in other meetings of the Governing Board's Finance Committee, since Hurricane Hugo, the Governing Board informally granted the Executive Director the authority to temporarily negotiate, sign and execute contracts and other transactions of the Authority for amounts in excess of $ 75,000, without prior consent of the Governing Board; therefore,
> BE IT RESOLVED BY THE GOVERNING BOARD: that the Executive Director of the Authority, Alberto Bruno-Vega, be authorized to negotiate, sign and execute contracts and other necessary transactions of the Authority for amounts in excess of $ 75,000, without prior consent and knowledge of the Governing Board, during the Authority's emergency efforts to restore service and to repair its facilities from the damages caused by Hurricane Hugo. Said authorization shall terminate upon the entry of a resolution of the Governing Board expressly terminating said temporary authorization.

WAPA Governing Board Resolution No. 240, at 1-2. Mr. Bruno-Vega agreed during his deposition that the resolution "acted as a

ratification of the acts he had taken previous [sic] for expenditure of amounts in excess of $ 75,000" and that, therefore, his signing of checks to Mr. Gardiner constituted "legally constituted act[s]." Bruno-Vega Dep. at 34.

During October WAPA did not charge customers for the water supplied from the well fields. In November, however, well before Mr. Gardiner ceased to provide security services, WAPA resumed billing its customers for water provided. Bowry Dep. at 23. On January 17, 1990 WAPA cut check number 11391, made out to WTE for the invoices for the weeks ending November 20 and 27 and the week ending December 4. On March 7, 1990, this check was voided and it was never tendered to Mr. Gardiner. To date, Mr. Gardiner has not been paid for his services.

## THE LAW AND DISCUSSION

*Motion for Summary Judgment*

A court may enter summary judgment under FED. R. CIV. P. 56 if the moving party shows that there is no genuine issue as to any material fact and, therefore, he is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). If the moving party sustains this initial burden, then the party opposing the motion must show that there is a genuine issue as to a material fact. *Jersey Cent. Power & Light Co. v. Lacey*, 772 F.2d 1103, 1109 (3d Cir. 1985) *cert. denied* 475 U.S. 1013, 89 L. Ed. 2d 305, 106 S. Ct. 1190 (1986). Not every issue of fact will be sufficient to defeat a motion for summary judgment. Issues of fact will only be considered "genuine" under Rule 56 "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). In deciding whether there is a disputed issue of material fact, the court must resolve all doubts in favor of the non-moving party. *Desvi, Inc. v. Continental Ins. Co.*, 968 F.2d 307, 308 (3d Cir. 1992).

Under this Court's Local Rule of Civil Procedure 56.1, motions for summary judgment must be accompanied by a

statement of material facts as to which the moving party contends there is no genuine issue, which shall include

414

references to the parts of the record relied on to support the statement. An opposition to such a motion shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement.

LRCi 56.1. While plaintiff's summary judgment motion was originally filed prior to the adoption of this rule, plaintiff has, in accordance with the rule, recently submitted an extensive statement of material facts not in issue. Defendant's response to this submission is somewhat perplexing and not in compliance with the rules. Instead of disputing the facts set forth by plaintiff, defendant set out its own list of undisputed facts and made no challenge at all to the facts set out by plaintiff. Plaintiff's reply to defendant's unorthodox response contends that material issues do exist with respect to many of the facts defendant cites.

*The Existence of a Contract between WAPA and WTE*

In examining the submissions of the parties, it is clear that this case has been unnecessarily complicated by disputes over factual issues which are not material to the key question of whether or not Mr. Gardiner and WAPA have a contract. The primary complicating factor is the involvement of the federal government in the disaster relief efforts on St. Croix in the aftermath of Hurricane Hugo. While defendant expends a great deal of energy examining the actions of the federal government in this matter, the Court finds that, by and large, the actions of the federal government are irrelevant to the question of the alleged contract between Mr. Gardiner and WAPA.[4] In fact, this Court finds that there are no genuine issues of material fact with respect to the existence of the contract (and its subsequent breach)—only questions of law which

---

[4] The information in the submissions pertaining to the federal assistance provided to restore water service to the citizens of St. Croix is relevant only to the question of whether or not WAPA may have an action for indemnification against the federal government for the funds it paid to Mr. Gardiner. The Court notes that there is strong evidence that the federal government agreed to reimburse some of WAPA's costs in this regard. This evidence, however, is not relevant to our current inquiry and would be better presented in a separate action by WAPA against the federal government for indemnification.

are properly decided on this motion. Therefore, based on the undisputed facts and the reasoning which follows, the Court finds that an express oral contract was formed between Mr. Gardiner and WAPA and that that contract was subsequently breached by WAPA.

Another issues which complicates this case is the fact that the express contract between the parties evolved over time. The law of this jurisdiction makes clear that

> The only essential prerequisite for creation of a valid contract is that the parties mutually assent to the terms and conditions of the agreement. The manifestation of mutual assent almost invariably takes the form of an offer by one party which is accepted by the other party.
>
> An offer is "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it. Assent is completed only upon acceptance of the offer by the offeree. An offer is accepted if, and only if, the terms of the acceptance mirror those of the offer.

*Paiewonsky Assocs. v. Sharp Properties, Inc.*, 26 V.I. 228, 231-232, 761 F. Supp. 1231, 1233 (D.V.I. 1991) *aff'd* 998 F.2d 145 (3d Cir. 1993) (citations omitted). While all of these conditions for the creation of a contract were eventually satisfied, the fact of the emergency situation and the desire of WAPA to ensure that it would be eligible for reimbursement from FEMA, slowed the process of forming an express contract considerably. Nevertheless, as the facts below make clear, such a contract was eventually formed, is binding, and has been breached by WAPA.

As a preliminary matter, the Court will enumerate certain undisputed facts which are critical to this case. First, WAPA has a statutory responsibility to provide water to the people of the Virgin Islands. *See,* V.I. CODE ANN. tit. 30 § 105(a) generally. Second, WAPA owns and operates the fresh water well fields at Adventure and Concordia. Bruno-Vega Dep. at 9. Third, no evidence has been presented to show that the responsibility for providing water—or for maintaining the well fields—was transferred from WAPA to the federal government because of the emergency situation. Fourth,

WAPA received a benefit from Mr. Gardiner's services; specifically it was able to fulfill its responsibility to provide fresh water and, in addition, to charge its customers for the water provided in the period following the hurricane.[5]

■ Against this backdrop, the Court must consider the facts surrounding the actual formation of the contract. Mr. Gardiner was first approached to provide security and maintenance for the equipment in WAPA's Concordia and Adventure well fields by two individuals, Mr. Green and Mr. Cipriani. Mr. Green is an employee of the USGS, a federal agency, and Mr. Cipriani was at that time the WAPA Superintendent of Water Distribution on St. Croix. It is undisputed that neither of these men had statutory authority to contract on behalf of their respective agencies. It is also undisputed, however, that Mr. Cipriani believed that he was entering into an agreement with Mr. Gardiner to provide security and maintenance services and that he intended to form a contract with Mr. Gardiner on behalf of WAPA (Cipriani Dep. at 26-28, 46-48) and that Mr. Gardiner believed that he was contracting with WAPA. (Gardiner Dep. at 17-19.) Finally it is undisputed that Mr. Gardiner agreed to provide the services described by Mr. Cipriani and Mr. Green and began performing the services discussed immediately. Therefore, the Court finds that the critical condition of "mutual assent" was fulfilled at this very first meeting.[6]

■ One of defendant's main arguments is that because Mr. Cipriani is not authorized to contract on behalf of WAPA, no Contract could exist. This is not the case, however, because Mr. Cipriani's arrangements with Mr. Gardiner were later ratified by Mr. Bruno-Vega (who did have contracting authority for WAPA

---

[5] Mr. Bowry's deposition suggests that WAPA did not charge its customers for water during the latter part of September and October, but did start billing in November, well before Mr. Gardiner's work ceased in December. Bowry Dep. at 23. Mr. Bruno-Vega, in his deposition, made no distinction between time periods and agreed that WAPA received the benefit of WTE's services and charged its customers for the water from the wells. Bruno-Vega Dep. at 18-19.

[6] It is disputed whether all of the terms of the contract—specifically the wage rates to be paid to Mr. Gardiner's employees—were agreed upon at this first meeting. However, even if such terms were not fully spelled out at the first meeting, this is not fatal to the contract. As will be discussed further below, extremely detailed discussions of Mr. Gardiner's rates eventually ensued and both parties assented to these rates.

during the emergency pursuant to Resolution No. 240 of the WAPA governing board) when he signed the checks in payment to Mr. Gardiner and when he allowed WAPA to continue to obtain the benefit of Mr. Gardiner's services. Despite the fact that Mr. Bruno-Vega now contends that there was never a contract between WAPA and Mr. Gardiner, he signed checks paying Mr. Gardiner without informing Mr. Gardiner that there was any problem. Nor is there any contention by defendant that anyone at WAPA told Mr. Gardiner that he should stop providing his services or that he would not be paid.[7] The effect of the ratification of Mr. Bruno-Vega of the agreement between Mr. Gardiner and Mr. Cipriani is that it has the full force of an authorized contract. Restatement (Second) of Agency § 100 (1958).[8]

This discussion of agency and ratification is critical to an understanding of why defendant's contention—that Mr. Gardiner's contract is with the federal government and not

---

[7] The somewhat unique status of WAPA as a public corporation makes a traditional analysis of the contracting authority of agents somewhat difficult. Different rules apply with respect to the authority of government agents than apply to private citizens acting as agents. Essentially, those dealing with government or public officials are assumed to have knowledge of the limits of their authority. *See, e.g. Richards v. B & L Development, Inc.*, 18 V.I. 87, 90-91 (D.V.I. 1980)("those who deal with a Government or officer are deemed to have notice of the limitations of his authority, and also that although a private citizen might be estopped in a similar situation, the public should not suffer for the act or representation of a single Government agent..."). Despite the differences in the actions of an agent of a public corporation and an agent of a private corporation in terms of the concept of apparent authority, the principles of ratification are equally applicable in both contexts. In *College of the Virgin Islands v. VITEX Corporation*, this Court stated, in reference to the former VICorp, a public corporation created by the United States Government, that

[r]epresentations or acts of an agent contrary to his instructions will not be binding upon the principal if the one which whom the agent is dealing has knowledge of the limitation on his authority, *unless, with knowledge of all the facts, the principal either waives the disobedience of the agent or adopts his act.*

6 V.I. 67, 72 (D.V.I. 1967) (emphasis added.)

[8] The Restatement (Second) of Agency, § 100 states:

Effect of Ratification; in General
Except as stated in Section 101, the liabilities resulting from ratification are the same as those resulting from authorization if, between the time when the original act was performed and when it was affirmed, there has been no change in the capacity of the principal or third person or in the legality of authorizing or performing the original act.

(The exceptions stated in section 101 of the Restatement are not relevant to the case at bar.)

WAPA—is incorrect. Regardless of whether Mr. Green was present at the initial meeting between Mr. Cipriani and Mr. Gardiner, it was Mr. Bruno-Vega who ultimately ratified the contract and gave it legal force. Mr. Bruno-Vega has no capacity to ratify a Contract entered into by Mr. Green, an employee of the USGS, and there is simply no evidence of ratification of the agreement by any other individual who could have ratified a contract entered into by Mr. Green. Additionally, it is absolutely undisputed that the well fields are owned by WAPA, that it was WAPA's responsibility to provide water to the residents of St. Croix, and that the benefit of Mr. Gardiner's services, in the form of payment for the water, accrued to WAPA.

■ WAPA's contention that this express oral contract is barred by the Statute of Frauds also fails. The Virgin Islands Statute of Frauds is codified at 28 V.I.C. 244. Subparagraph (1) of the provision refers to agreements that are "not to be performed within one year from the making thereof." The contract at issue was clearly intended from the outset to be short-term—essentially an emergency measure until the water distribution system was functioning properly. And, in fact, the contract was fully performed in less than four months. For these reasons, the Statute of Frauds simply does not apply.

Another issue cited repeatedly by defendant is its contention that the generators and pumps used in the well fields were (and are) owned by the federal government. With respect to this point, the Court has two comments. First, as plaintiff points out, there is some dispute as to the ownership of the pumps (Green Dep. at 23-24) and there is no evidence in the record clearly establishing who holds legal title to these pumps and generators. Second, and more importantly, the issue of ownership of the pumps and generators is irrelevant to the question of the existence of a contract between WAPA and Mr. Gardiner. There was an emergency on St. Croix and the provision of fresh water to residents was essential. Normally WAPA is fully capable of fulfilling its obligation to provide water, but under the circumstances brought on by Hurricane Hugo, help—in the form of 32 pumps, generators and booster pumps—was provided by the Army COE. WAPA's argument is apparently that, because the federal government was good enough

to provide equipment to assist WAPA in fulfilling its statutory duties, that the federal government should bear all of the costs of the provision of fresh water on St. Croix. This argument defies logic, is offensive to public policy considerations, and frankly has no legal merit.

Finally, WAPA argues that it is clear that Mr. Gardiner's contract was formed with the federal government (not WAPA) because Mr. Gardiner's rates were renegotiated *downward* twice during the course of the contract and each time a federal employee played a major role in the negotiations. Again WAPA's argument is unfounded. First of all, as the above discussion of agency and ratification makes apparent, the contract between Mr. Gardiner and WAPA did not become legally binding until it was ratified by Mr. Bruno-Vega when he signed the checks to WTE and chose not to signal his avoidance of the contract. It is clear, from the statement of undisputed facts above, that each of the two meetings in which Mr. Gardiner's wage rates were reduced occurred prior to an instance in which Mr. Bruno-Vega ratified the agreement by signing a check to WTE. Therefore, the new terms were part of the agreement that was ratified. Second, defendant's argument is again flatly contrary to important public policy considerations. WAPA's contention appears to be that because a federal official was instrumental in lowering the price of Mr. Gardiner's contract (*to the ultimate benefit of WAPA*) the cost of the entire contract should be born by the federal government. This argument is nonsensical. Finally, it is quite clear from the deposition testimony of Mr. Bruno-Vega, that Mr. Gardiner entered into the negotiations to reduce his price after discussions with Mr. Bruno-Vega indicating that the price was too high. Bruno-Vega Dep. at 23. In other words, the negotiations were instigated by Mr. Bruno-Vega, perhaps out of his desire to ensure federal reimbursement for monies paid to Mr. Gardiner. The fact is that in the context of this case, Mr. Fred Rounsaville's active involvement in the price negotiations with Mr. Gardiner is simply not pertinent to the question of whether or not a contract existed between Mr. Gardiner and WAPA.[9]

---

[9] It may well be that the fact of Mr. Rounsaville's involvement is relevant to the question of whether or not WAPA has a valid claim for indemnification against FEMA or some

Now that the Court has determined that WAPA had an express oral contract with Mr. Gardiner, the Court is also able to state that WAPA has breached that contract. It is undisputed that Mr. Gardiner submitted invoices for work done at agreed upon prices and that WAPA has yet to fully remunerate Mr. Gardiner. The question of the full amount of damages owed to Mr. Gardiner is reserved for trial.

## CONCLUSION

The record amassed in this case shows that the parties have serious disagreements about the legal question as to whether or not there existed a contract between Mr. Gardiner and WAPA. However, the record also reveals that there exists no genuine issue of material fact pertinent to the question of whether such a contract existed. As is the appropriate role of this Court on a motion for summary judgment, the legal questions at issue have now been decided and the result is that plaintiff's motion for summary judgment must be granted.

## ORDER

Having carefully considered all submissions of the parties, and for the reasons set forth in the opinion of this date, it is hereby

ORDERED that plaintiff's motion for summary judgment with respect to contract liability is GRANTED.

---

other agency of the federal government for all or part of the monies it has paid and owes to Mr. Gardiner. Nevertheless, that issue is not before this Court and, as the procedural history of this case makes clear, such a claim must be pursued separately by WAPA in the appropriate forum, assuming it has not been time-barred.